# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**THOMAS FRANCIS REBMAN AND
DANNY BRANDNER, INDIVIDUALLY
AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED,**

                              **Plaintiffs,**

**-vs-**                                    **Case No.  6:06-cv-1476-Orl-28KRS**

**FOLLETT HIGHER EDUCATION
GROUP, INC.,**

                              **Defendants.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

        This cause came on for consideration without oral argument on the following motion filed

herein:

| | |
|---|---|
| **MOTION:** | **PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (Doc. No. 72)** |
| **FILED:** | **July 30, 2007** |

        Plaintiffs Thomas Francis Rebman and Danny Brandner seek to serve as representative

plaintiffs for a nationwide class composed of "[a]ll persons and entities who purchased used textbooks

from Follett [Higher Education Group] at a School,[1] or who sold a used textbook to Follett [Higher

_____

        [1]  Plaintiffs have identified specific colleges and universities who have bookstore operating
agreements with Follett, which they refer to as School or Schools. *See* Doc. No. 106 at 2 & exs. A

Education Group] at a [Daytona Beach Community College] store, during the period between September 25, 2001 and present." Doc. No. 72 at 13. Rebman and Brandner filed a variety of exhibits in support of the motion, some of which are filed under seal. Doc. Nos. 78, 79.

Defendant Follett Higher Education Group, Inc. (Follett) responded to the motion. Doc. No. 86. Follett also filed exhibits in support of its response. Doc. No. 87.

With leave of Court, Rebman and Brandner filed a reply brief with an attached exhibit. Doc. No. 106.

The presiding district judge referred the motion to me for issuance of a Report and Recommendation.

## I.      BACKGROUND.

Defendant Follett, an Illinois corporation, manages bookstores throughout the United States. Doc. No. 1 ¶ 9. Follett entered into a Bookstore Operating Agreement (Agreement) with Daytona Beach Community College (DBCC) that allowed Follet to operate bookstores on DBCC's campus from July 1, 2003 through June 30, 2008. *Id.* ¶ 12 & ex. 3. Under the Agreement, Follett agreed to "charge industry standard, competitive and fair prices," as follows:

> a) On new textbooks and trade books, not more than the publishers' list price, or a 25% gross margin (cost divided by .75) on net price[2] books

---

& B.

[2] Net price is the cost price from the publisher. Shapiro Dep., doc. no. 78-7, at 54. List price, or retail selling price, is the selling price established by the publisher. *Id.* at 56. Stores determine the net price or list price, as applicable, from whatever source is available to them. These sources include Tom Tracks, Course Tracks, a blue book (a wholesale buying guide), or the publisher's invoice or packing list. *Id.* at 57-61; Tolly Dep., doc. no. 78-9, at 33-38; Thompson Decl., doc. no. 78-14 ¶ 4.

(inclusive of restocking fees and return penalties), plus a freight pass-through. . . . .

c) On used books, including cloth, paperback and others, not more than 75% of the new textbook selling prices. . . . .

Agreement ¶ 9.2(a), (c).  Under the Agreement, Follett also committed to

purchase used textbooks adopted for the next academic term in quantities sufficient to meet course requirements at not less than 50% of the retail price.  Follett shall purchase used books not adopted for the next academic term or in excess of course requirements at wholesale prices.

*Id.* ¶ 9.4.  The Agreement requires Follett to pay a commission to DBCC based on Follett's gross revenue.  *Id.* ¶ 10.[3]

Gary Shapiro, a Follett Senior Vice President, testified that the used textbook discount selling price was developed for " a lot of reasons . . . . The customer satisfaction is huge and sell through is much better on used."  Shapiro Dep. at 71.  The discount used when Follett purchases used textbooks (the "buyback" price)  was also based on a number of reasons.  *Id.* at 64-65.  Shapiro attested that students like to sell their used textbooks, and it was "also economically good for Follett because there [are] no freight costs involved . . . ."  *Id*. at 64.  Shapiro also averred that "used books sell better than new books because of Internet competition.  So if you have a used book at a lower price than a new book, you'll sell it."  *Id.*

The standard practice in the bookstore industry is to round up used textbook prices to the next higher increment of $0.25.  Shapiro Dep. at  24-25, 94; McCollum Dep., doc. no. 78-8, at 14-15; Tolly Dep. at 66-68; Follett's answers to interrogatories, doc. no. 78-10 ¶ 5; Parish Decl., doc. no. 87-2 ¶¶ 7-8; Dowdell Dec., doc. no. 87-3 ¶¶ 9-11; Pribyl Decl., doc. no. 87-4 ¶ 11.   This was done to increase

---

[3]  The Agreement does not have a choice of law provision.

the store's profit margin on the sale.  McCollum Dep. at 26-27.  Since 2005, the standard practice at Follett has been to round the price paid to buy back a used textbook to the nearest increment of $0.25, whether higher or lower than the buyback price required by a contract.  McCollum Dep. at 21-22, 54-55.  This was done for "convenience of cash."  *Id.* at 22; *see also* Tolly Dep. at 18.  Follett standardized its pricing policies in a policy and procedure manual.  McCollum Dep. at 19-20, 28-29.

Rebman and Brandner were students at DBCC.  Doc. No. 1 ¶ 11.  Rebman and Brandner bought used textbooks from Follett at prices they allege exceeded the contractual price because Follett rounded up the selling price of a used textbook to the next highest increment of $0.25 over the retail price.  *Id.* ¶ 34; McCollum Dep. at 48-49 & Doc. No. 78-12 (used textbooks purchased by Brandner rounded up by $0.07).  Rebman also sold three used textbooks to Follett, all of which had been adopted for the next academic term.  Doc. No. 1 ¶ 36.  Follett paid Rebman less than 50% of retail value for two of the textbooks as a result of rounding down the buyback price to the next lower increment of $0.25.  *Id.* ¶¶ 37-43; McCollum Dep. at 57-58 (Follett paid Rebman exactly 50% of the new textbook price for one used textbook buyback).

Rebman and Brandner allege that they are intended third-party beneficiaries of the Agreement, and that Follett breached the Agreement by overcharging them in the purchase of used textbooks and underpaying in the buyback of used textbooks.[4]  Doc. No. 1 ¶¶ 51-60, 67-76.  They further allege that Follett engaged in unfair and deceptive trade practices in violation of section 501.204, Florida Statutes (FDUTPA)  by charging more for the sale of used textbooks and paying less for the buyback of used textbooks than permitted by the Agreement.  *Id.* ¶¶ 61-66, 77-82.  Finally, they allege that Follett and

---

[4]  Rebman and Brandner allege that Follett breached other provisions of the Agreement, which allegations do not appear to be relevant to the present motion.

DBCC[5] conspired to engage in unlawful and deceptive breach of the Agreement in violation of

FDUTPA in order to obtain profits for Follett and commissions for DBCC.  *Id.* ¶¶ 83-88.

Rebman and Brandner seek to be class representatives for all individuals or entities who

purchased used textbooks from certain Follett bookstores throughout the United States or who sold

used textbooks to Follett's DBCC bookstores, to the extent that these transactions violated the terms

of the contracts between Follett and the School.  *See* Declaration of Jeffrey N. Berman In Support of

Plaintiffs' Motion for Class Certification (Berman Decl.), doc. no. 78-6 (summarizing pricing

provisions for sale of used textbooks in various contracts).[6]  They also propose the following

subclasses: (1) a nationwide class of individuals and entities who purchased used textbooks from

Follett who were damaged by breach of contract; (2) a Florida subclass of individuals and entities who

purchased used textbooks from certain Follett bookstores in Florida who were damaged as a result of

---

[5]  DBCC was originally named as a defendant in the case.  Plaintiffs subsequently voluntarily dismissed these claims.  Doc. Nos. 62 & 63.  Plaintiffs do not seek certification of a class as to the civil conspiracy cause of action.

[6]  The summary reflects that many contracts have the same language as the pricing provision for sale of used textbooks contained in the Agreement.  However, the summary also reflects that other contracts use variations of that language, applying the discount to the "current new textbook selling prices"; "current prices"; "original new textbook selling price"; "current pricing for similar or identical new textbooks/instructional materials"; "current retail price"; "discounted 25% from the publisher's list price"; "corresponding new textbook price"; "current retail new selling or publisher's list price, whichever is lower"; "current retail selling price"; "publisher's suggested retail prices"; "current retail price of a new textbook of the same ISBN"; "current new list price"; "the price of the book when new"; and, "25% off the current new textbook selling prices."  Berman Decl.  Follett interprets some of these provisions in the same way it interprets the discount pricing provisions of the Agreement.  McCollum Dep. at 61.  Finally, Follett presented evidence that some of the contracts contain "anti-third party beneficiary"and arbitration provisions not contained in the Agreement.  *See* doc. no. 87-6.  Thereafter, Rebman and Brandner submitted a narrowed list of Schools to exclude the contracts with these provisions.  Doc. No. 106 at 1 & exs. A & B.

breach of contract and FDUTPA violations; and, (3) a DBCC subclass of individuals and entities who purchased used textbooks from or sold used textbooks to Follett at the DBCC location and were damaged due to breach of the Agreement and FDUTPA violations.  Doc. No. 72 at 14.

## II.    APPLICABLE LAW.

"Questions concerning class certification are left to the sound discretion of the district court." *Cooper v. Southern Co.*, 390 F.3d 695, 711 (11th Cir. 2004).  "For a district court to certify a class action, the named plaintiffs must have standing, and the putative class must meet each of the requirements specified in Federal Rule of Civil Procedure 23(a), as well as at least one of the requirements set forth in Rule 23(b)." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1250 (11th Cir. 2004).

Rule 23(a) allows a class to be certified if:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  In addition, as the plaintiffs are seeking certification under Rule 23(b)(3), they must show that: (1) there are questions of law or fact common to the members of the class that predominate over those questions affecting individual class members only, and (2) a class action is superior to other available methods for fair and efficient adjudication of the controversy.  "The burden of proof to establish the propriety of class certification rests with the advocate of the class." *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003).

"[N]othing in either the language or history of Rule 23 . . . gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974).  However,

"both the Supreme Court and [the United States Court of Appeals for the Eleventh Circuit] have noted

since *Eisen* that evidence pertaining to the requirements embodied in Rule 23 is often intertwined with

the merits, making it impossible to meaningfully address the Rule 23 criteria without at least touching

on the 'merits' of the litigation." *Cooper*, 390 F.3d at 712.

### III.   ANALYSIS.

   *A.     Breach of Contract Causes of Action.*

   The first issue that must be addressed is whether Rebman and Brandner individually have

standing to bring causes of action for breach of contract. "The focus of the standing inquiry is 'whether

the plaintiff is the proper party to bring this suit.'" *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 981

(11th Cir. 2005)(quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)).[7]

   Neither Rebman nor Brandner is a party to the Agreement.  Rebman and Brandner allege that

they have standing to bring the breach of contract claims as third-party beneficiaries to the Agreement.

"The question of whether, for standing purposes, a non-party to a contract has a legally enforceable

right therein is a matter of state law." *Bochese*, 405 F.3d at 981.

   Counsel agree that Florida law governs the causes of action for breach of the Agreement. *See*

Doc. Nos. 99, 102.

> "Florida courts have recognized three types of third party beneficiaries
> to a contract: (1) donee beneficiaries; (2) creditor beneficiaries; and (3)
> incidental beneficiaries." *Int'l Erectors, Inc. v. Wilhoit Steel Erectors
> & Rental Serv.*, 400 F.2d 465, 471 (5th Cir. 1968) . . . . The key
> distinction is that the first two categories are classes of "intended"

---

   [7] This is a different inquiry than whether all members of a putative class would have
standing, which was the issue raised in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999).  Thus, the
Supreme Court's statement in *Ortiz* that standing could be addressed in that case following the
class certification decision is inapposite here.

> beneficiaries, who have a right to sue for enforcement of the contract, whereas the third category, "third party beneficiaries recognized as incidental beneficiaries[,] have no enforceable rights under a contract." *Id.* . . . The *intent* of the parties is the key to determining whether a third party is an intended (*i.e.,* donee or creditor) or only an incidental beneficiary. *See, e.g., Marianna Lime Prods. Co. v. McKay*, 147 So. 264, 265 (Fla. 1933).

*Bochese*, 405 F.3d at 981 (internal citations omitted). "The contracting parties' intent to benefit the third party must be *specific* and must be *clearly expressed* in the contract in order to endow the third party beneficiary with a legally enforceable right." *Id.* at 982 (citing *Am. Sur. Co. v. Smith*, 130 So. 440, 441 (Fla. 1930)).

The Agreement does not expressly refer to Rebman, Brandner, students of DBCC or other purchasers of used textbooks from the Follett's DBCC bookstores as intended third-party beneficiaries. However, individuals not specifically named in a contract may be third-party beneficiaries if they are members "of the limited class which was intended to benefit from the contract." *Technicable Video Sys., Inc. v. Americable of Greater Miami, Ltd.*, 479 So. 2d 810, 812 (Fla. 3d Dist. Ct. App. 1985).

Rebman and Brandner contend that the Court may conclude that individuals who purchased used textbooks from or sold used textbooks back to Follett's DBCC bookstores were intended to be third-party beneficiaries of the Agreement based on the rationale used in cases arising in the insurance industry. Doc. No. 106 at 6 (citing *Vencor Hosps. v. Blue Cross Blue Shield*, 169 F.3d 677 (11th Cir. 1999), and *Mallo v. Public Health Trust*, 88 F. Supp. 2d 1376 (S.D. Fla. 2000)). Rebman and Brandner also cite cases from other jurisdictions, none of which appear to apply Florida law or discuss a discount pricing contract similar to the Agreement. *See* Doc. No. 106 at 6 & n.5. Accordingly, I will review only the cited decisions issued by the Eleventh Circuit.

In *Vencor Hospitals*, the Eleventh Circuit held that Vencor hospitals were third-party beneficiaries of a contract between Blue Cross Blue Shield and the individual insureds who had been treated at a Vencor hospital.  The court based its finding on language in the contract that provided that payment could be made "to the doctor, hospital or to you directly at our discretion." *Vencor Hosps*., 169 F.3d at 680.  The court reasoned that "[b]y providing for payment directly to the hospital, the contracting parties showed a clear intent to provide a direct benefit to Vencor (or any other service-providing hospital), and thus Vencor has standing to bring this suit." *Id.*  Accordingly, *Vencor Hospitals* does not support Rebman and Brandner's argument because it was based on specific reference in the contract to a class of intended beneficiaries, which language is not in the Agreement.

In *Mallo v. Public Health Trust*, the issue was whether the plaintiff had standing to bring a civil rights suit under 42 U.S.C. § 1983 against a health care provider for attempting to recover monies due for treatment provided in excess of the amount paid under Medicaid.  The plaintiff contended that the attempt to recover additional funds violated the federal statute that precludes health care providers from billing Medicaid patients more than the amount paid from Medicaid funds (the "balance billing provision").  To decide the question, the court considered whether Congress intended the balance billing provision to benefit the plaintiffs. After reviewing the statutory scheme, the court concluded that plaintiffs were intended third-party beneficiaries because, among other things, the statutory scheme was expressly designed to benefit the poor who qualified for Medicaid coverage.  *Mallo*, 88 F. Supp. 2d at 1385.  In the present case, there is no evidence of an overarching policy by Follett to enter into discount pricing agreements to benefit students or others who engage in used textbook transactions at Follett bookstores.  Indeed, the presence of anti-third-party beneficiary provisions in some Follett

bookstore contracts suggests that no such policy exists.  Accordingly, the rationale in *Mallo* does not appear to be applicable in the present case.

 If the intent of the contracting parties is not clear from the contract, the Court may consider extrinsic evidence of the parties' intent.  Such evidence must establish "that the parties to the contract actually and expressly intended to benefit the third party; it is not sufficient to show only that one of the contracting parties unilaterally intended some benefit to the third party." *Morgan Stanley DW Inc. v. Halliday*, 873 So. 2d 400, 403 (Fla. 4th Dist. Ct. App. 2004). Rebman and Brandner do not cite to evidence currently before the Court that *both* Follett and DBCC actually and expressly intended the discount pricing provision of the Agreement to benefit purchasers such as Rebman and Brandner.[8]

 Accordingly, in the present motion, Rebman and Brandner have not satisfied their preliminary burden of showing that they have individual standing to bring the breach of contract causes of action. Because each of the proposed classes and subclasses is based on the breach of contract claims, class certification is not appropriate at this time as to any class proposed by the plaintiffs.

  B. *FDUTPA Causes of Action*.

 Anticipating that the plaintiffs will contend that the Court should, nevertheless, certify solely a FDUTPA class, I will briefly discuss the issues underlying that argument.  "[A] consumer claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d Dist. Ct. App. 2006). "FDUTPA applies to private causes of action arising from single unfair or deceptive acts in the conduct

---

 [8] In the present motion, Rebman and Brandner argue that extrinsic evidence of intent is not necessary, because "[i]t is black letter law that the intent of contracting parties is determined from an examination of the four corners of the contract, not the contents of each party's thoughts." Doc. No. 72 at 30.

of any trade or commerce, even if it involves only a single party, a single transaction, or a single contract." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003). If the Court finds that Follett's practice of rounding up the sale price of used textbooks to the nearest $0.25 increment and, as to the DBCC bookstores, sometimes rounding down the buyback price for used textbooks to the nearest $0.25 increment is an unfair or deceptive trade practice, Rebman and Brandner have presented facts sufficient to show that they suffered *de minimus* damages as a result of this practice. Thus, they have individual standing to bring the FDUTPA claim.

It appears that Rebman and Brandner seek certification of a nationwide class as to both the breach of contract and FDUTPA causes of action. *See* Doc. No. 72 at 13-14 n.28. Rebman and Brandner have not shown that class certification of a nationwide FDUTPA class would be appropriate under Rule 23. In *Hutson v. Rexall Sundown, Inc.*, 837 So. 2d 1090 (4th Dist. Ct. App. 2003), the court discussed the propriety of a FDUTPA class action as to non-Florida residents arising from purchases of calcium supplements that allegedly bore deceptive labeling and were sold through deceptive advertising. The court reasoned that "[t]he alleged wrong was committed, and the damage done, at the site of the sale of appellees' products; that is, in the various states where members of the purported class made their purchases." *Id.* at 1094. Accordingly, the court held that "common issues of law do not predominate because the claims of non-resident consumers would require the application of consumer protection laws from each of the states where the deceptive trade practice occurred and the non-resident claimants suffered injury." *Id.*

In the present case, like *Hutson*, the consumers allegedly were damaged when they purchased used textbooks at a price different from that provided for in the operative contract between Follett and the School at which the bookstore was located. The sales are alleged to have occurred in various

states.  As such, the laws governing unfair and deceptive trade practices at the site of the sale would control.  Because the laws of different states regarding unfair trade practices would control depending on the state in which the purchase at issue was made, Rebman and Brandner have not met their burden of establishing that common questions of law would predominate as to a FDUTPA nationwide class.

If Rebman and Brandner seek to proceed solely on a Florida FDUTPA class, they must show that the amount in controversy exceeds $5 million for this Court to exercise subject matter jurisdiction. *See* 28 U.S.C. § 1332(d).[9]  Rebman and Brandner do not allege in the complaint the amount in controversy as to solely a Florida FUDTPA class.

Plaintiffs' collective individual actual damages are estimated to be only $0.31. Doc. No. 86 at 2.  While Follett admits that it sold more than 1000 used textbooks in each calendar year at issue from bookstores in Florida, doc. no. 78-15 ¶ 18, there is no showing how many of those sales resulted in damage to the purchaser as a result of rounding up the price or the aggregate amount of such damage. There is also no evidence of how many buyback transactions occurred at the DBCC bookstore during the relevant time, much less how many of those transactions involved rounding down the buyback price or the aggregate amount of such damage.  *See* Doc. No. 72 at 16 (speculating on the number of buyback transactions that might have occurred).  Thus, until sufficient information is presented to show

---

[9]  The Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), gives federal district courts original jurisdiction over "any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which – (A) any member of a class of plaintiffs is a citizen of a State different from any defendant."  There is no dispute that the minimal diversity required by § 1332(d) exists in the present case.  "[T]he claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs."  28 U.S.C. § 1332(d)(6).

that this Court could exercise jurisdiction over a Florida FDUTPA class, it is premature to consider the issue of whether such a class would meet the certification requirements of Rule 23.

## IV.    RECOMMENDATION.

For the reasons discussed herein, I respectfully recommend that the Court **DENY** without prejudice Plaintiffs' Motion for Class Certification (Doc. No. 72), with leave to refile it, if appropriate, on a schedule to be established by the Court after the pending motion for summary judgment is resolved.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on January 16th, 2008.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy